United States Court of Appeals,

Eleventh Circuit.

No. 94-6343.

Michael Leroy DOLIHITE, Individually and as Father and Next Friend of David Michael Dolihite; Joyce Mary Dolihite, Individually, Plaintiffs-Appellees,

v.

Robert MAUGHON, M.D., Deceased, By and Through Mary Fay VIDEON, as Executrix of the Estate of Robert Maughon, M.D.; Royce G. King, Individually; R. Emmett Poundstone, III, Individually; Anthony R. Dykes, Individually; Bradley Mazick, Individually; Karen Jurls, individually; Andrew McBride, Individually; Chester Jenkins, M.D.; Medical Money Management, Inc., Defendants-Appellants,

The Alabama Department of Mental Health; Eufaula Adolescent Center; Neuropsychiatry Associates, P.C.; Medical Management, Inc., Defendants.

Jan. 23, 1996.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-92-H-1398-N), Truman M. Hobbs, District Judge.

Before KRAVITCH, ANDERSON and EDMONDSON, Circuit Judges.

ANDERSON, Circuit Judge:

The appellants in this § 1983 action argue that the district court erred in denying them summary judgment on the basis of qualified immunity. We affirm the district court's denial of summary judgment as to one of the appellants, Karen Jurls. We reverse the district court's order as to the remaining appellants; we hold that they are entitled to summary judgment on qualified immunity grounds.

On February 17, 1991, the Baldwin County Juvenile Court, having adjudged David Dolihite in need of supervision, ordered David committed to the Eufaula Adolescent Center ("Eufaula"), a facility of the Alabama Department of Mental Health and Mental

Retardation ("ADMHMR"). David was not admitted to Eufaula until almost a year later, on January 13, 1992. He was fifteen years old. Approximately seventy days after his arrival at Eufaula, David hung himself. Although he was resuscitated, the injury he sustained during his suicide attempt left him severely brain-damaged.

David's parents, individually, and David's father, as his next friend ("the plaintiffs"), brought this § 1983 action against various mental health professionals and administrators working for or under contract with ADMHMR. The individual defendants include: Bradley Mazick, Ph.D., Eufaula's clinical director; Karen Jurls, a Eufaula social worker; Andrew McBride, a licensed psychologist with Eufaula; Medical Money Management, Inc., a private corporation under contract with ADMHMR to provide psychiatric services to Eufaula; Drs. Robert Maughon [1] and Chester Jenkins, psychiatrists in the employ of Medical Money Management, Inc.; Anthony Dykes, Eufaula's director; Emmett Poundstone, ADMHMR Associate Commissioner for Mental Health; and Royce King, ADMHMR Commissioner.

The Dolihites allege that the defendants violated David's substantive rights under the due process clause of the Fourteenth Amendment set forth in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct.

---

[1] During the course of this litigation, Dr. Maughon died. After this event, the plaintiffs amended their complaint substituting the name of Mary Fay Videon, the executrix of his estate for Dr. Maughon's name. For the sake of simplicity and brevity we will refer to Dr. Maughon with the understanding that our holding applies to the now-named defendant, Mary Fay Videon.

2452, 73 L.Ed.2d 28 (1982),[2] i.e., his right to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as might be required to ensure safety and freedom from restraint. *Id.* 457 U.S. at 315-17, 102 S.Ct. at 2458-59. Discovery was completed. The defendants all moved for summary judgment on qualified immunity grounds. The district court denied their motions. *Dolihite v. Videon,* 847 F.Supp. 918 (M.D.Ala.1994). The defendants-appellants brought this interlocutory appeal. We have jurisdiction. [3]

---

[2]Although *Youngberg* involved a civilly committed mentally retarded person, this circuit has interpreted the *Youngberg* holding to apply to involuntarily, civilly committed mental patients. *See, e.g., Wooten v. Campbell,* 49 F.3d 696, 701 (11th Cir.1995) ("In *Youngberg*..., the Court extended the *Estelle* analysis holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the state to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety' from themselves and others."); *Rodgers v. Horsley,* 39 F.3d 308, 311 (11th Cir.1994) ("In *Youngberg,* the Court created the general legal principle that persons who are involuntarily committed to state mental institutions have a right to safe conditions, freedom from bodily restraint, and a right to minimal training.")

[3]Neither party challenges our jurisdiction under the recent Supreme Court opinion, *Johnson v. Jones,* --- U.S. ----, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). After careful review, we conclude that we have jurisdiction of this appeal. In *Johnson,* the only argument made on appeal by the public official seeking qualified immunity was that the district court erred in concluding that there was a genuine issue of fact as to the official's involvement in the act. The act itself was a violation of clearly established law. The Court noted that this "evidence insufficiency" issue was different from the qualified immunity issue held to be immediately appealable in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Several "countervailing considerations" persuaded the Court to decline extending the rule of immediate appealability to include "evidence insufficiency" issues. *Johnson,* --- U.S. at ----, 115 S.Ct. at 2158.

In *Ratliff v. DeKalb County, Georgia,* 62 F.3d 338 (11th Cir.1995), this court addressed an issue similar to that in *Johnson v. Jones.* After accepting jurisdiction and

resolving one claim for qualified immunity, the court addressed the public officials' claim of qualified immunity with Note 3—Continued respect to Ratliff's claim of gender discrimination. The public officials' only argument with respect to this claim of qualified immunity was that the record did not support any discriminatory intent on their part. *Id.* at 341. This court, noting that discriminatory intent was a necessary element of the underlying constitutional tort, declined to review the district court's determination that there was a genuine issue of fact as to whether appellants acted with discriminatory intent. Like the nonreviewable issue of fact in *Johnson*—i.e., whether the appealing public official was actually involved in the allegedly unconstitutional beating—the issue of fact on appeal in *Ratliff* was also a predicate factual element of the underlying constitutional tort. Also like *Johnson, Ratliff* involved an "evidence insufficiency" issue. *See also, Mastroianni v. Bowers,* --- F.3d ----, 1996 WL 17032 (11th Cir.1996) ("Insofar as appeals from denials of summary judgment relate to "factual disputes' or "insufficiency of evidence' regarding plaintiff's claim, this court lacks appellate jurisdiction."); *Babb v. Lake City Community College,* 66 F.3d 270, 272 (11th Cir.1995) ("An order determining the existence or non-existence of a triable issue of fact—the sufficiency of the evidence—is not immediately appealable.").

Unlike *Johnson* and unlike *Ratliff,* the primary argument of each appealing public official in this case is that a reasonable public official could have believed that his or her actions were lawful, in light of clearly established law and the information possessed by each official. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). This argument raises the core qualified immunity issue and is, therefore, immediately appealable under *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and *Johnson.*

With respect to several subissues relating to several of the appellants, in order to evaluate the core qualified immunity issue presented by each appellant, we have identified precisely the relevant actions of the appellant and the relevant information possessed by each, of course, taking all reasonable inferences in favor of Dolihite. We are confident we have jurisdiction to do this. *Cf. Anderson v. Romero,* 72 F.3d 518, ---- (7th Cir.1995) ("[The issue] is whether in 1992 the constitutional right of a prisoner in [plaintiff's] position ... to be free from the specific acts that the defendants are alleged to have committed was clearly established...."). As is apparent from the above statement of the core qualified immunity issue, which statement was paraphrased from *Anderson,* 483 U.S. at 639,

107 S.Ct. at 3039, it is necessary to examine the precise actions of each appellant and the precise information possessed by each appellant in order to determine whether a reasonable public official could have believed that his or her actions were lawful, in light of clearly established law.

With respect to several of the mental health professionals in the instant case, to determine what law is clearly established, we must undertake a fact-sensitive examination of controlling case law, particularly *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990). We must then compare the facts in such case law (which have been determined to be in violation of the Constitution) with the precise actions and the precise knowledge of the actors in this case. For example, appellant Dr. Jenkins in the instant case is comparable to the psychiatrist in *Greason.* Dr. Jenkins' actions, and his knowledge at the time, must be identified precisely and then compared to the actions and knowledge of the psychiatrist in *Greason.* Only if the actions of Dr. Jenkins, in light of his knowledge, are materially similar to the actions and knowledge of the psychiatrist in *Greason* can it be said that he could not have thought that his actions were lawful. *See Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc).

Thus, the identification of the actions and knowledge of each public official is part and parcel of the core qualified immunity issue which is immediately appealable. This inquiry is distinguished from the factual issues found to be unreviewable in *Johnson* and *Ratliff* in at least two respects. First, in both *Johnson* and *Ratliff,* the issue on appeal involved a predicate element of the underlying constitutional tort; by contrast, in this case, the issue we address is the core qualified immunity issue—i.e., whether a reasonable public official could have believed that his or her actions were lawful in light of clearly established law and the information possessed. Second, in both *Johnson* and *Ratliff,* the challenge on appeal involved the sufficiency of the evidence to create a genuine issue of fact; by contrast, in this case each appealing public official raises the core qualified immunity issue identified above.

Our conclusion that we have jurisdiction to identify the precise actions and the precise knowledge of each appellant is supported by the recent Eighth Circuit decision in *Reece v. Groose,* 60 F.3d 487 (8th Cir.1995). In *Reece,* the court held that it had jurisdiction "to examine the facts as they were known to the government official in order to determine whether clearly-established law would be

violated by his actions," *id.* at 489, Note 3—Continued *noting that* Anderson required acceptance of such jurisdiction. Numerous other courts appear to have implicitly assumed such jurisdiction. *See, e.g., Lennon v. Miller,* 66 F.3d 416, 422-26 (2d Cir.1995) (undertaking review of "undisputed facts," i.e., record evidence concerning the facts underlying plaintiff's claim, to determine whether police officers' actions were objectively reasonable); *Rodriguez v. Phillips,* 66 F.3d 470, 480-81 (2d Cir.1995) (examining circumstances of prison to determine whether it was objectively reasonable for the official to believe plaintiff's administrative confinement did not violate his constitutional rights); *Buonocore v. Harris,* 65 F.3d 347, 357 (4th Cir.1995) (noting that, to determine whether actions violated clearly established law, the court must examine the facts as alleged by plaintiff); *Sanderfer v. Nichols,* 62 F.3d 151, 154-55 (6th Cir.1995) (appellate court itself identified the relevant actions of the public official, a nurse, in order to evaluate whether she was deliberately indifferent to a pretrial detainee's medial needs); *Prosser v. Ross,* 70 F.3d 1005, 1006 (8th Cir.1995) (noting that the district court failed to indicate what facts it believed to be in dispute and searching the record for undisputed facts, and also noting that the limitation imposed by *Johnson* "will sometimes make it difficult to determine whether jurisdiction exists because deciding whether an officer is entitled to qualified immunity requires a "fact-intensive' inquiry"). We have found no contrary authority.

Even if we are incorrect in our conclusion that the identification of the precise acts and knowledge of each appealing public official is part and parcel of the core qualified immunity issue, we are satisfied that it would be "inextricably intertwined" with the core issue, and thus would be within our pendent appellate jurisdiction. *See Swint v. Chambers County Comm'n.,* 514 U.S. ----, ----, 115 S.Ct. 1203, 1212, 131 L.Ed.2d 60 (1995) (also suggesting that pendent issue jurisdiction may exist where review of the pendent issue is necessary to ensure a meaningful review of the qualified immunity issue); *Johnson,* --- U.S. at ----, 115 S.Ct. at 2159 (suggesting that pendent issue jurisdiction of even evidence insufficiency issues may exist). When an appealing public official presents the core qualified immunity issue, we believe that we have pendent appellate jurisdiction of other issues presented by such official if the other issues are "inextricably intertwined" with the core issue. *See Blue v. Koren,* --- F.3d ----, ---- n. 6, 1995 WL 759536 (2d Cir.1995) (finding that the district court's ruling that a genuine issue of material fact remained with respect to the qualified immunity issue is reviewable under the court's pendant jurisdiction where

it is intertwined with the constitutional claim and is necessary for a meaningful review of whether the district court applied the appropriate standard). Every circuit to address *Swint* 's reference to "inextricably intertwined" issues has concluded that such pendent jurisdiction exists. *See, e.g., Kincade v. City of Blue Springs,* 64 F.3d 389, 394-95 (8th Cir.1995); *Kaluczky v. City of White Plains,* 57 F.3d 202, 206-07 (2d Cir.1995); *Moore v. City of Wynnewood,* 57 F.3d 924, 930 (10th Cir.1995). In this case, even if the identification of the precise actions and knowledge of each appellant is not part and parcel of the core issue, as we believe it is, the above discussion conclusively demonstrates that the issue is "inextricable intertwined." Indeed, it is absolutely necessary to identify precisely the public official's actions and knowledge in order to resolve the core qualified immunity issue.

Ordinarily, we might simply "take as given" the district court's identification of each appellant's actions and knowledge. *See Johnson,* --- U.S. at ----, 115 S.Ct. at 2159. However, with respect to the appellants in this case other than Jurls, we cannot conclude that the district court's identification of the actions and knowledge of each appellant was adequate. The Supreme Court in *Johnson* acknowledged that in such a circumstance, an appellate court appropriately would have to undertake such identification. *Id. Cf. Rivera v. Senkowski,* 62 F.3d 80, 84-85 (2d Cir.1995) (examining record evidence where district court failed to articulate an adequate factual basis upon which it relied in declining to hold defendants immune from suit). With respect to appellant Jurls, our identification of her actions and knowledge is consistent with that of the district court; in other instances, we have made the identification more precise. Especially in the context of health care professionals providing medical care, the core qualified immunity inquiry is exceedingly fact sensitive on both sides of the coin. On the side of the coin involving the determination of clearly established law, it is necessary to identify precisely the acts and knowledge of the comparable actor in controlling cases. On the side of the coin involving the actions of the appealing public official, it is necessary, as we have demonstrated, to identify precisely the actions and knowledge of the appealing public official. As we stated in *Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc), a plaintiff cannot rely upon general propositions or abstractions to demonstrate a violation of clearly established law; rather, the facts of the controlling precedent must be materially similar to those in the instant case. *Id.*

86 L.Ed.2d 411 (1985).

This opinion will set out the background facts and the relevant law and then address the entitlement of each defendant to qualified immunity. In the summary judgment posture of this case, we take all reasonable factual inferences in favor of the plaintiffs below. However, the plaintiffs bear the burden of proof. With respect to each appellant, we have taken the relevant facts as identified by the district court and supplemented same as necessary to evaluate whether a reasonable public official could have believed that the actions of each appellant were lawful, in light of the clearly established law and in light of the information possessed by each appellant.

## I. BACKGROUND FACTS

In February of 1991, the Baldwin County Juvenile Court adjudged David Dolihite in need of supervision because of David's problematic behavior at home and at school. [4] The court placed David in the custody of ADMHMR and instructed the Department to return the child to the custody of his parents after he successfully completed the Eufaula program. David continued to reside, for the most part, with his parents until he was admitted to Eufaula on January 13, 1992. [5]

---

[4]At the time of the adjudication David had no juvenile convictions or history of drug or alcohol abuse. But by March he had been adjudged delinquent because he drew a knife on someone at the Boys Home in Robertsdale where he was sent while waiting to go to Eufaula. As a result of this incident he was again sent home. When he violated his probation by misbehaving at school, he was sent to the Hit Program, a Department of Youth Services Program in Montgomery, Alabama.

[5]The district court opinion indicates he was admitted on this date in 1991, but this appears to have been a typographical

By January 23, 1992, David had been evaluated by three of the defendants—Dr. Maughon, a psychiatrist, Jurls, a social worker, and McBride, a psychologist.[6]  It was determined through these evaluations that David had reported having attempted suicide,[7] had frequent suicidal ideations, was obsessed with writing poetry about death, and had some family history of suicide.[8]  Appellees also contend that behavior described in David's Baldwin County Mental Health Department evaluation could be construed as psychotic.[9] After his initial Eufaula evaluations, David was assessed as giving the "diagnostic impression of conduct disorder solitary aggressive type."

Ten days after David's arrival, the psychiatrist Dr. Jenkins

error.

[6]According to the record, appellant Mazick, the Eufaula clinical director, did not see David at this point.

[7]David told Jurls during her initial interview with him that he had attempted suicide ten times, that he made his first gesture in the fourth grade.  He also described other attempts which had occurred within two years of his arrival at Eufaula. However, Jurls appears to have been skeptical about whether these attempts ever occurred or at least the nature of the attempts. "There is some question as to the actual pervasiveness of his [suicidal] thoughts and whether or not they appear to be more manipulative in nature or the result of significant clinical depression."  At least one suicide threat was documented in his Baldwin County Mental Health Center Evaluation.  David threatened suicide in March of 1991 in a poem he gave to a former girlfriend.

[8]Evidence in the record below indicates that David's grandmother committed suicide;  however, the portion of David's Eufaula record which discusses the incident gives the impression that David's father's grandmother committed suicide.

[9]"He denies hallucinations at this time;  however, in a very detached manner he describes looking in the mirror and seeing no reflection, seeing hands beckoning him and seeing the ghost of someone killed in a car wreck."

and appellants McBride and Jurls became members of David's treatment team and, as such, signed David's master treatment plan. The treatment plan noted, among other things, that David suffered an active suicidal ideation and gesture problem, and it prescribed weekly, thirty-minute individual therapy sessions as well as a weekly forty-five-minute group session.

David exhibited self-destructive behavior while at Eufaula, including making suicidal threats and gestures. The following incidents occurred while David was at Eufaula and are documented in his Eufaula record unless otherwise indicated. On January 26, 1992, a nurse treated David for a deep puncture wound in his left wrist. David told the nurse that he "was going to cut his arm off and kill himself." David was placed on continuous observation, i.e., one-on-one observation, until the next day when Jurls, after completing a suicide assessment, moved him to close observation with one-hour checks.[10] On the suicide assessment form, Jurls noted that David's family did not have knowledge of David's past suicide attempts and that David's self-reported past gestures could not be confirmed. In David's Progress Notes, Jurls indicated that his reported suicidal thoughts were intermittent and without genuine intent.

---

[10]The nurse apparently refused to give him medication for pain. In his Progress Notes Jurls wrote, "He claimed to be upset because Nursing Services did not provide treatment to a small puncture on his hand." In her suicide assessment of David conducted the following day, Jurls wrote: "I interviewed him on 1/27/92 and he appeared nondepressed and denied all suicidal ideation. He was verbal and animated. David did admit to being frustrated 1/26/92 10:30 pm and reported himself to having only a fleeting thought of suicide." She then moved him from continuous observation to close observation status and indicated that he was to be checked every hour.

In David's Progress Notes dated February 4, Jurls indicated that David had presented as extremely irrational during the previous week; she added that he was not out of touch with reality. On the afternoon of that day, David injured himself, creating an ulcer one centimeter in diameter on his left wrist. On February 13, a staff member reported that David wrote with a rock on the security screen over his window, "Oh, God I want to die, please take me or I'll commit suicide, Death, Suicide are the facts of life." David was given work restitution for his behavior but no additional therapeutic intervention, nor was he prescribed any medications, and no suicide assessment form was completed.[11]

On February 18, David was talking to himself and advised a nurse that he was talking "to a friend who told him what to do." On February 24, a staff member found David sitting on the floor in his room beside the figure of a star he had made of salt, cutting into a sore on the back of his wrist with his belt buckle, and allowing blood to drip onto the star. David told the staff member he was a devil-worshipper. David later that day wrote the staff member a note which indicated that he was not talking because the devil told him not to. On March 2, Jurls indicated in David's Progress Notes that he continued to enjoy the "shock value" of talking about suicide.

On March 8 at about 2:45 p.m., David cut his arm with a piece of metal. A staff member described the incident in David's

_____

[11]In Jurls' affidavit, she said that she performed a suicidal risk assessment and that David denied suicidal intent; however, there is no suicide assessment form in record with respect to this incident.

Progress Notes:  "When I arrived in the dorm he was standing in the bathroom and his left arm in the sink and the $H_2O$ running, bleeding profusely from a cut to his left arm...."  David was taken to the emergency room.  The cut required ten stitches and, as indicated by Jurls on David's suicide assessment form, was "fairly lethal due to vertical, wide cut and possibility of loss of excessive blood."

Around 4:45 p.m. the same day, David removed the sutures with his teeth.  He told the Eufaula nurse that "he was going to kill himself and he was not going to have sutures put in" and "would remove them again."  The nurse notified Dr. Jenkins about David's behavior.  Over the phone, Dr. Jenkins prescribed 25 mg of Vistaril, a tranquilizer, and authorized the use of soft restraints.  David was taken to the emergency room again.  Jurls ordered David placed on continuous, i.e., constant, observation.

The next day Jurls completed a suicide assessment form on David.  According to her notes, David denied suicidal intent, psychotic symptoms, and feelings of depression, but admitted self-injurious thoughts due to problems with peers.  Although David's act of cutting himself and pulling his sutures out on March 8 was apparently determined to be a suicidal gesture or attempt, David was never seen by the psychiatrists or by Dr. Mazick nor was his treatment plan altered.[12]  However, Jurls did change his status

---

[12]The affidavits of John Fowler and Billy Kirby, two of David's fellow Eufaula residents, also indicate that David was placed in seclusion for removing his sutures.  His records indicate that he was secluded on March 9, but for failure to follow staff instructions.

This is not the only incident for which David was secluded.  Before his injury, David was sent to seclusion for a total of about 14 hours.  It was apparently common

to close observation with fifteen minute checks.  Thereafter, his
observation status was not changed again until the morning of March
24.

On March 15, David was secluded for "failure to follow rules,
bleeding on walls and defecating on floor" in the time-out room.
Once secluded, David continued to spit blood on the walls of the
seclusion area.

On March 18, David stuck a pencil in his wound of March 8.  He
was again taken to the emergency room.  Dr. Nixon, having treated
David twice for his self-inflicted wound of March 8, requested
David be evaluated by a psychiatrist.  She wrote, "This child MUST
be evaluated for anti-psychotic medication."[13]  Jurls arranged for
David to see Dr. Jenkins the next day.

Dr. Jenkins examined David on March 19.  His notes in David's
records state only the following:  "This young man has been
engaging in self-destructive behavior.  Case reviewed with
therapist and nurse.  No current or past evidence of psychosis.

_____

practice at Eufaula to place a disruptive child in various
forms of confinement, the milder version being dorm
restriction which apparently meant that a child could not
leave his dormitory or his dorm room except to attend
classes or meals.  Staff members could also place children
in "time-out" which required children be confined in a
particular room with a staff member checking on them every
fifteen minutes.  During his time at Eufaula, David was kept
in time-out for approximately 70 hours.  Seclusion was a
more serious confinement, an extreme measure.  Residents at
Eufaula were apparently secluded individually in a building
separate from the dormitories in one of three small rooms
resemblant of bare jail cells with concrete floors, no
furniture and no heat.

[13]Dr. Nixon noted in David's file that the March 18 incident
was the third episode of self-mutilation which had come to her
attention (including the removal of his March 8 stitches).

MS: alert, oriented. Thought orderly. Affect indifferent. Memory and intellect intact. This difficulty seems behavioral. "I think I messed up and may be a little bit crazy.' " There is no further indication in the record of what sort of assessment or examinations were completed to render this conclusion. David's treatment plan was not altered.

On Saturday, March 21, at 9:25 p.m., a staff member ordered David placed in seclusion after David destroyed facility property, threatened to cut himself with a piece of glass, and stated he was going to hurt himself if he got the chance.[14] While in seclusion, David beat his head on a wall, cursed loudly and was described as "totally out of control." The nurse on duty notified Dr. Maughon over the phone about David's behavior. Dr. Maughon instructed the nurse to administer 50 mg of Vistaril.

On Sunday, March 22, around 9:30 p.m., a mental health worker restricted David to the time-out room for destroying facility property.[15] According to the time-out records completed by mental health worker Allen Forte, David attempted to hang himself at 9:35 p.m. At 9:40 p.m. David was placed in seclusion. According to the defendants, Forte did not inform his shift supervisor of this incident, and the supervisor made no mention of it in his shift

---

[14]The social worker on duty stated in David's Progress Notes that David was secluded for failing to follow staff's directions, threatening to do harm to himself, inciting a racial riot, and causing disruption to therapeutic environment.

[15]David had torn his closet door off its hinges and had knocked a hole in it. David told the worker that he had mood swings and felt like destroying something.

report.[16] There is no evidence that the hanging incident was mentioned in the shift report or that the clinical staff discussed it at their March 23, morning meeting.

On Tuesday, March 24, at 8:45 a.m., Jurls met with David. The Progress Notes indicate that the two of them discussed the previous weekend, specifically David's destruction of property and aggression. Neither in the Progress Notes themselves nor elsewhere in David's record is it documented that Jurls knew about the weekend hanging attempt.[17] At that meeting she told David that the treatment team had met the previous morning and had decided to give David three days dorm restriction due to his behavior.

Her Progress Notes of March 24 also indicate that she had left instructions for the dorm staff to take David off close observation status on the morning of March 21 if March 20 had been uneventful. According to the Progress Notes, the dorm staff did not receive that order. Jurls renewed the order effective 1:20 p.m. on March 24.

Although David's records do not reveal that Jurls knew of the attempted hanging, the plaintiffs presented evidence that Jurls did know about the incident. A former Eufaula resident, John Fowler, signed an affidavit stating:

---

[16]The seclusion order indicated that the reasons for seclusion were David's physical aggression toward staff and his attempt to pull down a light fixture out of the ceiling. Samuel Denson, another mental health worker, rather than Allen Forte filled out the seclusion form.

[17]Jurls did write in David's Progress Notes of March 24, that he "continue[d] to resort to self-injurious behavior when angered or frustrated" but this might have referred to his behavior of March 19 (sticking the pencil in his wrist wound) or his behavior of March 21 (threatening to cut himself).

I was in the time-out room on March 22, 1992.... David did try to hang himself. Ms. Jurls knew this because the next day, David and I talked with Ms. Jurls about it. Ms. Jurls spoke to both of us together about David trying to hang himself the night before. She knew David had tried to hang himself and she confronted us together about it and David admitted it in her presence and in my presence.

At 3:30 p.m. on March 24, after David went off close observation, Dr. Mazick and David had a short discussion[18] during which Dr. Mazick, apparently not cognizant of David's self-injurious behavior of the previous weekend, told David that he had not engaged in self-injurious behavior for several days and that he "did not see that [David] needed to remain on close observation."

Shortly afterwards, at 4:10 p.m., David was found hanging in his dormitory room closet by a shoestring. Emergency CPR was performed and David was resuscitated. He was then sent to Children's Hospital in Birmingham where it was determined that he suffered severe hypoxic brain damage. According to the district court, as of March, 1994, David remained in serious condition and functioned at the level of a three-year old.

The record reflects that during David's seventy days at Eufaula, he received three and one half hours of individual therapy with Jurls, a social worker, and six hours of group therapy. He was secluded for a period of fourteen hours, on dorm restriction for ten days, and in time-out for sixty-four hours. He was only seen by a psychiatrist twice, once upon admission and again on

---

[18]According to Mazick's affidavit, David expressed an interest in speaking with Mazick in a seemingly chance encounter which occurred while David was in the hall outside Jurls' office.

March 19.  Dr. Mazick, the staff's Ph.D. psychologist, saw David briefly on March 24.

In the affidavits of Billy Kirby and John Fowler, as well as the testimony of Allen Forte, the plaintiffs presented evidence that at Eufaula there was gang activity, violence between residents, and abuse by the staff.  John Fowler stated that David came to his room once to hide from gang members, that he told Jurls that gang members were threatening David, and that staff allowed gang members to mistreat other residents.  He also claimed that the Eufaula staff hit and cursed at the residents,[19] that he had seen staff members hit David and another resident on numerous occasions, and that he personally told Dykes, Jurls, and Dr. Mazick about those incidents.  He also asserted that staff members put the residents in time-out and seclusion for inappropriate reasons.  In sworn testimony, Allen Forte, a former Eufaula employee, testified that he had seen supervisors strike children and that a twelve-year-old resident had been sexually abused twice by other residents.

The appellees also introduced the Eufaula FY 91-92 Advocacy Report as evidence that violence was rampant at Eufaula.  That report indicated that thirty-three complaints were filed by residents.  However, the report itself does not indicate the substance of more than a few of those complaints. [20]  The report

_____

[19]He also stated that once a staff member threw Billy Kirby, another resident, down the stairs.

[20]The report did recount the complaints behind some of the investigations.  One resident reported being kicked in the ribs by another resident;  another resident reported being hit in the face by a staff member;  a third resident reported that a staff

focuses instead on whether the investigations of those incidents were adequate. It concluded that they were not and that staff needed training on how to conduct proper investigations.

## II. DISTRICT COURT'S DECISION

The district court, in denying the defendants' motions for summary judgment, stated that under the Eighth Amendment "[i]t is well settled that state governments possess "a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration,' " *Dolihite v. Videon,* 847 F.Supp. 918, 926 (M.D.Ala.1994) (citing *Harris v. Thigpen,* 941 F.2d 1495, 1504 (11th Cir.1991)). The court noted that persons subjected to involuntary civil commitment are " "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.' " *Id.* (citing *Youngberg v. Romeo,* 457 U.S. 307, 322, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982)). Thus, the court concluded that *Romeo* made it clear that the Fourteenth Amendment due process requirements imposed on state officials who are entrusted to care for those who have been civilly committed to state institutions are considerably more rigorous than those imposed under the Eighth

---

member had threatened to beat him up; a fourth investigation revealed that a resident might have been secluded as a means of punishment; and a fifth resident requested a referral to the nurse for treatment of an injury but was not seen until the following afternoon. Some investigation accounts were included as attachments to the Advocacy Report. In one a resident reported a mental health worker hit him in his mouth; another indicated that a staff member had been cursing at the residents; a third concerned the incident in which a resident reported being kicked in the ribs by another resident; and, a fourth described an incident in which a resident reported a bruise on his right eye.

Amendment which are applicable to prisoners." 847 F.Supp. at 926.

The district court, in elucidating the law to be applied, set forth the rule established in *Romeo,* which held that "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. at 2462. The district court also cited the Eleventh Circuit cases *Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989), and *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990), for the proposition that it is also well settled that officials in charge of the care of prison inmates are liable if put on notice of suicidal tendencies and fail to take reasonable precautions to prevent suicide. The court reasoned that this rule would necessarily apply to those trained to care for emotionally disturbed youths given the *Romeo* rule that due process rights of the civilly committed exceed the Eighth Amendment rights of the criminally incarcerated.

With respect to Jurls, a social worker and David's primary therapist, the district court focused on the Fowler affidavit which indicated that Jurls knew about the March 22 attempted suicide. The court also concluded that a jury could find that she did in fact read the portion of David's record which indicated that he had attempted to hang himself. *Id.* at 931-32. There being evidence that she knew of the suicide attempt of March 22, but failed to take steps to prevent David from attempting suicide, the district court determined that our precedent under *Greason* dictated a

conclusion that her actions, taken in the light most favorable to the plaintiffs, would amount to deliberate indifference thus precluding summary judgment on qualified immunity grounds.

The district court denied the other defendants' motions for summary judgment. All the defendants here appeal that court's denial of their motion for summary judgment on qualified immunity grounds. We first set forth the appropriate qualified immunity analysis, and then we address the facts and law relevant to each individual appellant's case.

### III. QUALIFIED IMMUNITY

The denial of qualified immunity is a question of law to be reviewed *de novo. Swint v. City of Wadley,* 51 F.3d 988 (11th Cir.1995). Because this is an appeal from the denial of a summary judgment motion, we must view the facts in the light most favorable to the plaintiff below. *Id.*

The qualified immunity analysis requires the court to determine whether a defendant violated clearly established constitutional law.[21] In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court explained that qualified immunity protects government officials performing discretionary functions from civil liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* 457 U.S. at 818, 102 S.Ct. at 2738.

---

[21]The first step of the analysis is to determine whether the officials were acting within their discretionary authority. *Sammons v. Taylor,* 967 F.2d 1533, 1539 (11th Cir.1992). That the defendants were acting within their discretionary authority is uncontested here.

Qualified immunity is intended to give officials the ability to anticipate when their conduct may give rise to liability for damages. *Anderson v. Creighton,* 483 U.S. 635, 645, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) ("Where [the qualified immunity] rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law."). A plaintiff must establish more than broad legal truisms; he or she must demonstrate that the law fixed the contours of the right so clearly that a reasonable official would have understood his acts were unlawful. *Id.* at 639-640, 107 S.Ct. at 3039. Thus, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc) (emphasis in the original). Moreover, officials need not " "be creative or imaginative in drawing analogies from previously decided cases.' " *Id.* at 1150 (citations omitted).

In *Anderson,* the Supreme Court described the qualified immunity analysis:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).

Our courts have applied an objective reasonableness test to

qualified immunity cases. In each circumstance, taking the facts known to the particular defendant, "the relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990).

As a general matter, under *Romeo* the involuntarily civilly committed have liberty interests under the due process clause of the Fourteenth Amendment to safety, freedom from bodily restraint, and minimally adequate or reasonable training to further the ends of safety and freedom from restraint. 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In addition, *Romeo* established that the involuntarily civilly committed were due a higher standard of care than the criminally committed; persons subjected to involuntary civil commitment are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* 457 U.S. at 322, 102 S.Ct. at 2461. Thus, it follows from *Romeo* that, all other circumstances being the same, actions of a mental health professional which would violate a prisoner's Eighth Amendment rights would also violate the due process rights of the involuntarily civilly committed.[22] An official violates a

---

[22]This holding does not require that public officials " "be creative or imaginative in drawing analogies from previously decided cases' " in contravention to *Lassiter. Lassiter,* 28 F.3d at 1150. The conclusion is set forth in the plain language of *Romeo* and requires no analogies.

prisoner's Eighth Amendment rights when the official is deliberately indifferent to the prisoner's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Although *Romeo* establishes that the involuntarily civilly committed have certain due process rights and that those rights are at least as extensive as the rights of the criminally institutionalized, that broad legal truism is insufficient to clearly establish the law for purposes of overcoming the appellants' qualified immunity claims in this case.[23] In determining whether the appellants in this case are entitled to qualified immunity, we must look at case law which sets forth the contours of the due process rights recognized in *Romeo.* Because, under *Romeo,* the due process rights at stake were at least equivalent to the comparable Eighth Amendment rights of the criminally committed, relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed.

We will address the facts relevant to each individual appellant in light of the relevant case law. We must determine whether that law clearly established the conclusion that a reasonable official at the time of the appellant's actions, knowing what the appellant knew, would have realized that those acts violated David's constitutional rights.

---

[23]Moreover, in *Romeo,* the Supreme Court did not decide whether the facts of that case would amount to a violation of the plaintiff's due process rights. Rather the Supreme Court remanded the case for the lower courts to decide.

IV. THE APPELLANTS

A. *Karen Jurls*

As David's primary therapist, Eufaula social worker Jurls had the most frequent contact with David during his time at Eufaula. She conducted a social history on him when he was admitted; she knew he reported having threatened and or attempted suicide before his arrival; she was on his treatment team; she was assigned to counsel him weekly for one half hour and to act as co-therapist during his weekly group therapy session;[24] she knew of David's self-injurious or suicidal behavior while at Eufaula; she conducted the two written suicide assessments in the record; she contacted Dr. Jenkins when it was recommended that David be evaluated for anti-psychotic medication; and, she maintained David on close observation status for much of his time at Eufaula because of the various incidents in which David threatened to commit suicide or exhibited suicidal gestures. Most significantly, for our purposes, the plaintiffs have produced evidence from which a fact finder could conclude that Jurls knew that David attempted to hang himself on March 22[25] but that she nevertheless took him off of close observation status without taking any other measures to protect his safety or otherwise meet his mental health care needs.

As the district court indicated, our precedent in *Greason*, 891

---

[24]The record indicates that David's therapy did not occur as often as prescribed.

[25]There is a factual dispute as to whether or not David attempted to hang himself on March 22, and also with respect to Jurls' knowledge thereof. In the summary judgment posture of this case, we take the reasonable factual inferences in favor of the plaintiffs.

F.2d 829 (11th Cir.1990), is relevant. In *Greason,* an inmate committed suicide while in the Georgia Diagnostic and Classification Center ("GDCC"), a Georgia Department of Corrections facility where the decedent was being held. The decedent's family brought a § 1983 action, alleging that the mental health professionals and administrators at the facility were deliberately indifferent to the decedent's mental health needs in violation of the Eighth Amendment. Calvin Brown, the mental health team leader in charge of the inmate's (Greason's) care and one of the defendants in that case, was denied summary judgment on qualified immunity grounds. Brown knew that while at the facility Greason had been experiencing feelings of despair and thoughts of suicide and on one occasion had attempted to kill himself by tying something around his throat. This incident had been reported to Brown well before Greason's final suicide, not only by two inmates, but also by Greason's parents who on a visit to the facility asked Brown for his help with respect to the problem. *Id.* at 832 & n. 8. Nevertheless, Brown did not notify the staff psychiatrist or put Greason on suicide watch. The court concluded such conduct violated the decedent's Eighth Amendment rights:

> The question here is a narrow one: whether Brown's failure to monitor Greason after having been warned by Greason's parents and two inmates that Greason had tried to commit suicide constituted deliberate indifference.
>
> Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference.

*Id.* at 835-36 (footnotes omitted). The court affirmed the district court's denial of Brown's motion for summary judgment on qualified

immunity grounds concluding "that a reasonable person in Brown's position would have known that his provision of care constituted deliberate indifference to Greason's eighth amendment rights...." *Id.* at 836.

The situation in this case is comparable to that of Brown in *Greason.* Jurls admits that she knew of David's history of mental illness, i.e., his suicide threats and attempts or gestures and his self-injurious behavior. If a jury found that she knew of his self-injurious behavior over the weekend beginning March 21, especially the attempted hanging on March 22, Jurls' decision to take David off of close observation on March 24 presents a situation comparable to Brown's behavior in *Greason.* Like Brown in *Greason,* Jurls failed to notify any of the psychiatrists or psychologists available to her and failed even to continue the protective measures already in place for David. Rather than protecting David or seeking professional guidance, Jurls' alleged behavior actually put David at greater risk of suicide. Thus, her decision is comparable to the decision which was held to constitute deliberate indifference in *Greason.*

Because the constitutional violation on such facts was clearly established in *Greason,* we conclude that plaintiffs-appellees have adduced sufficient evidence to support findings of fact which would constitute a violation by Jurls of clearly established constitutional rights. Thus, we affirm the district court's denial of summary judgment with respect to Jurls.

B. *Andrew McBride*

McBride, a staff psychologist at Eufaula, conducted one of

David's initial evaluations and was on David's treatment team. His primary contact with David appears to have been as co-facilitator of David's group therapy sessions. McBride knew about David's history and many of the incidents which occurred while David was at Eufaula. The plaintiffs contend that McBride should be liable because he failed to take action after David's hanging attempt. However, the plaintiffs do not argue that McBride knew about David's March 22 hanging attempt.[26] Rather, they argue that his failure to apprise himself of that information and to take action to prevent David from doing further injury to himself in light of that information constituted a constitutional violation.

The fact that McBride did not know about the hanging attempt sets his situation apart from Jurls'. McBride indicated that during Monday morning community meetings, the residential staff would report to clinical staff what of importance happened over the weekend. The plaintiffs allege that McBride saw the seclusion report. McBride, however, testified that he read the March 23 Progress Note but was only "informed" of a seclusion report. The Progress Notes recorded on March 23 indicated that on both March 21 and March 22 David was secluded, in part, for attempting to do harm to himself. This information is substantially the same as that which would have been available had he read the March 21 and March

_____

[26]The district court's opinion is not clear, but it may have thought that McBride knew of the March 22 hanging attempt. 847 F.Supp. at 933 ("McBride did not perform a suicide assessment on David at that time, despite his awareness of Mr. Forte's report, McBride depo. at 28-32...."). However, our careful review of the deposition reveals no suggestion that McBride knew of the hanging attempt; indeed, McBride expressly disavows such knowledge. Nor is there other evidence that McBride knew.

22 seclusion reports. Thus, there is no evidence McBride was apprised of the hanging attempt, but he was on notice that David's self-injurious tendencies persisted through the weekend.

McBride's failure to inquire further and seek out the record for closer inspection should be considered in light of the fact that the clinical staff not on duty on weekends apparently regularly relied on the residential staff to report important incidents occurring on weekends and that neither the residential staff nor the portion of the record McBride reviewed indicated that David's threats to do harm to himself involved a hanging attempt. Also, the appellees do not assert that McBride knew about or took part in the decision to take David off close observation.[27] Without knowledge of the March 22 hanging attempt and with no apparent role in the decision to take David off close observation, we cannot conclude McBride's failure to take action after the weekend of March 21-22 constituted a violation of clearly established constitutional law under *Greason*[28] or other relevant Eighth or Fourteenth Amendment case law.

Although the plaintiffs presented as evidence an affidavit

_____

[27]The fact that he did take part in putting David on dorm restriction does not indicate that he took part in the decision to take David off of close observation status; there is no indication in the evidence presented and plaintiffs do not allege that dorm restriction meant that a resident was automatically taken off close observation.

[28]The actions of Calvin Brown, the mental health team leader in *Greason,* can be distinguished from McBride's actions here. Brown took no measures to protect Greason or to seek appropriate help for Greason. The evidence in the record indicates that, as far as McBride knew, measures were being taken to protect David from himself, i.e., David was on close observation status and was being monitored every fifteen minutes.

from an expert which stated that Andrew McBride "failed to meet the basic professional standards in the evaluation, assessment, and treatment" of David, the affidavit does not with any specificity indicate how McBride's evaluation and treatment of David failed to meet basic professional standards. A conclusory affidavit of this nature provides little support for the appellees' claim.

The Dolohites also allege that McBride should be liable because he failed to recommend that David be transferred to another facility even though he considered David actively suicidal and knew that Eufaula's policies did not authorize admitting actively suicidal patients. *See* Eufaula Adolescent Center Policy No. 3.47, Admission Criteria, # 2.E. However, no cases hold that a government official's violation of facility or department policy, without more, constitutes a constitutional violation. *See, e.g., Edwards v. Gilbert,* 867 F.2d 1271, 1276-77 (11th Cir.1989), *modified, reh'g denied, Edwards v. Okaloosa County,* 23 F.3d 358 (11th Cir.1994). Our case law does indicate that failing to transfer or accommodate the serious health needs of a prisoner could amount to a constitutional violation. In *Howell v. Evans,* 922 F.2d 712, 722-23 (11th Cir.1991), *vacated as moot,* 931 F.2d 711 (11th Cir.1991), *reinstated by unpublished order as noted,* 12 F.3d 190 (11th Cir.1994), this court concluded that a superintendent of a correctional facility was not entitled to qualified immunity under the following facts. The superintendent knew that an inmate had an urgent need for a particular type of medical personnel. After the denial of the superintendent's recommendation that the inmate be medically released, the superintendent failed to seek the

needed personnel on his own initiative.  Instead, he relied on the medical administrator to seek funding for the personnel through the regular budgetary process.

The case at bar is different from  *Howell.*  In  *Howell,* the facility medical staff indicated to the superintendent that the "prisoner could not be treated under the then current conditions" of the facility.  In the case before us, the record indicates that the Eufaula staff could have treated David.  Even the plaintiffs' experts do not contend that Eufaula was not equipped to treat David.  Rather, the expert affidavits simply point to deficiencies in the actions of Eufaula's professional personnel.[29]

We conclude that the facts adduced by appellees fail to show that defendant McBride violated clearly-established constitutional law.

C. *Medical Money Management, Dr. Chester Jenkins, and Dr. Robert Maughon*

### 1. The Medical Money Management Contract

Drs. Jenkins and Maughon were psychiatrists who, as employees of Medical Money Management, Inc., were under contract with Eufaula to:  provide psychiatric services on a consulting basis, admit residents, write initial treatment plans, determine patients' admitting diagnoses, prescribe medications, perform medication reviews, examine residents before discharge, provide expert testimony in court, and provide twenty-four hour call coverage.  As physicians under contract with the state, the psychiatrists were

---

[29]For instance, Dr. Abraham Halpern, the plaintiffs' psychiatric expert, concludes that David should have received psychiatric medication and more intensive therapy.  Both options were apparently available at Eufaula.

state actors subject to liability under § 1983. *See West v. Atkins,* 487 U.S. 42, 55-58, 108 S.Ct. 2250, 2259-60, 101 L.Ed.2d 40 (1988); *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 703 (11th Cir.1985). Because they are individuals subject to liability under § 1983, the psychiatrists are also entitled to raise qualified immunity as a defense to liability.

The district court concluded that the psychiatrists, as members of David's treatment team, had broad authority and implicitly broad responsibility notwithstanding their allegedly limited duties under the Medical Money Management contract. *Dolihite v. Videon,* 847 F.Supp. at 930. However, only Dr. Jenkins was on David's treatment team, and the fact that Dr. Jenkins was on David's treatment team does not, in and of itself, indicate that he had broader responsibilities than those set forth under the contract. Significantly, appellees have not adduced evidence that the psychiatrists had a duty to follow up on every patient at Eufaula. The contract indicates that after a resident was admitted, the psychiatrists were only obligated to follow up on patients in order to perform medication reviews.[30]

The psychiatrists did have a duty to do intake evaluations, initial diagnoses and initial treatment plans and to provide psychiatric services when consulted. Thus it is incumbent upon us to examine how each psychiatrist performed when called upon to fulfill these duties.

2. Dr. Chester Jenkins

[30]Although both Drs. Maughon and Jenkins prescribed Vistaril, a tranquilizer, for David, the plaintiffs do not contend that that prescription triggered the duty to follow-up.

a. Facts Relevant to Dr. Jenkins

Dr. Jenkins was the psychiatrist assigned to David's treatment team.  Although he did not conduct David's initial evaluation or render the initial diagnosis, Dr. Jenkins signed David's treatment plan in late January, 1992.  The plan listed suicidal ideations and gestures among David's primary problems and recorded Dr. Maughon's diagnosis of "conduct disorder solitary aggressive type."  David next came to the notice of Dr. Jenkins on March 8, when a Eufaula staff member notified him by phone that David had purposely cut his arm, stated that he "want[ed] to commit suicide," and then purposefully removed the stitches from the self-inflicted wound.  Over the phone Dr. Jenkins authorized the use of Vistaril, a tranquilizer, and soft restraints, if necessary.  Dr. Jenkins did not follow up on the incident.

Then on March 18, after David stuck a pencil in the wound of March 8, Eufaula staff again contacted Dr. Jenkins about David. That day Dr. Nixon, the emergency room doctor who had also treated David on March 8, indicated emphatically in David's medical records that David needed a psychiatric examination.[31]  The next day, March 19, was the first day and the only time that Dr. Jenkins either saw David or reviewed David's record.  According to Dr. Jenkins, he spent about one half hour with David.  He conducted a "mental status examination."  Dr. Jenkins' notes of this examination, as recorded in David's record, are cursory.  Dr. Jenkins wrote that he had reviewed David's case with David's nurse and therapist, that

---

[31]She wrote:  "MUST be evaluated by Psychiatrist for antipsychotic medication...."

David had been engaging in self-destructive behavior, that there was no current or past evidence of psychosis, that David was "alert" and "oriented," that his thought was orderly, his affect indifferent, and his memory and intellect intact. Dr. Jenkins concluded, "This difficulty seems to be behavioral."

Although the scope of Dr. Jenkins' March 19 "mental status examination" was not well-developed by the plaintiffs, it is apparent from Dr. Jenkins' deposition that he formed the opinion that there was no evidence of clinical depression, delusions, or psychotic behavior. It was Dr. Jenkins' opinion that David was exhibiting "non-suicidal self-destructive behavior," i.e., behavior that was harmful but not life-threatening and behavior for which there was some explanation. The explanation was that such behavior was impulsive and related to things about which David was angry or frustrated—i.e., David was using such behavior in a manipulative fashion. Dr. Jenkins' ultimate opinion was that there was not a need for psychotropic drugs and that David's problem was behavioral.

### b. Allegations Against Dr. Jenkins

The plaintiffs do not allege that Dr. Jenkins took part in the decision to take David off close observation on March 24 or that Dr. Jenkins had any contacts with David between the March 19 evaluation and David's March 24 suicide attempt. The plaintiffs do allege that Dr. Jenkins failed to recognize David's obvious signs of clinical depression and bipolar disorder and to diagnose him accordingly. They contend that David's history of suicide threats and his family history of suicide, his increasing episodes of

self-mutilation and mood swings should have led to that diagnosis. They assert that Dr. Jenkins should have prescribed intense and lengthy one-on-one therapy and antidepressant medication for David and that the failure to do so was a total departure from professional judgment.

The plaintiffs contend that Dr. Jenkins had the duty to make such a diagnosis and recommend such treatment when he was consulted on March 8 and then again when he was consulted on March 19. They also assert that Dr. Jenkins failed to exercise professional judgment when he did not see David on March 8. They argue that on March 19, when he did see David, he failed to do an in-depth evaluation or even an in-depth review of the record.[32] They argue that an in-depth review of the record would have revealed evidence of David's serious mental illness illustrated by David's March 15 episode of bleeding and defecating on the walls of the time-out room as well as other unspecified instances indicating serious mental illness. The plaintiffs also cite Dr. Jenkins' cursory notes on the examination as evidence that Dr. Jenkins did not do any testing or in-depth evaluation. Finally, the plaintiffs contend that Dr. Jenkins also failed to have the Ph.D. psychologist, Dr. Mazick, see David for more in-depth testing.

c. Expert Testimony Against Dr. Jenkins

The plaintiffs presented expert medical testimony. Our

---

[32]Apparently, both the plaintiffs and Dr. Halpern in his expert affidavit are confused about which psychiatrist was involved in the March 19 and March 21 incidents. The defendants note that Dr. Jenkins, not Dr. Maughon, evaluated David on March 19 and Dr. Maughon, not Dr. Jenkins, prescribed the Vistaril tranquilizer on March 21.

circuit has indicated that the testimony of medical experts can aid the court in determining whether qualified immunity is appropriate where allegations hinge upon the appropriateness of the actions of medical professionals, including mental health professionals. *See Howell v. Evans,* 922 F.2d 712, 722-23 (11th Cir.1991), *vacated as moot,* 931 F.2d 711 (11th Cir.1991), *reinstated by unpublished order as noted,* 12 F.3d 190 (11th Cir.1994); *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990); *Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989); *Rogers v. Evans,* 792 F.2d 1052 (11th Cir.1986). Such expert medical testimony, making reference to specific deficiencies in a defendant's treatment and specific medically accepted standards might, in conjunction with the specific facts of a case, persuade a court that the medical defendant's actions in the case were clearly as great a departure from appropriate medical standards as previous departures found unconstitutional in prior cases—i.e., might persuade a court that a reasonable professional in defendant's shoes would have known that his challenged actions (or inaction) violated plaintiff's constitutional rights.[33]

The plaintiffs presented the affidavit of Dr. Abraham L. Halpern, a certified and practicing psychiatrist. His affidavit states that the psychiatrists' treatment of David was "a total departure from professional judgment, practice or standards such

---

[33]However, an expert opinion which is merely conclusory, even if couched in the language of the relevant legal standard, will be of little assistance to a court. *See, e.g., Rogers v. Evans,* 792 F.2d 1052, 1062 n. 9 (11th Cir.1986) (approving lower court's order striking affidavit of medical expert where the affidavit was "phrased in conclusory terms without citing facts" and concluding that the affidavit was "defective to create a factual dispute.")

that it cannot be said that their treatment of David was based on accepted professional judgment."  However, Dr. Halpern's affidavit suffers from several flaws.

First, Dr. Halpern was not careful to discuss Dr. Maughon and Dr. Jenkins separately.  Instead, Halpern often referred to "their treatment" of David.  And, when he did discuss them individually, Dr. Halpern confused the two doctors' roles in their treatment of David;  his affidavit indicates that Dr. Maughon examined David on March 19 and Dr. Jenkins prescribed Vistaril for David on March 21, when in fact it was Dr. Jenkins who performed the examination on March 19 and Dr. Maughon who received the call on March 21.  Also, Dr. Halpern assumes that the psychiatrists under contract with Eufaula had a duty to manage and follow up on each patient.  As discussed, *supra,* Medical Money Management's contract did not call for that[34] nor does any other part of the record indicate that the consulting arrangement or accepted medical standards required monitoring and follow-up on any patients aside from those patients receiving medication.[35]  The terms of the agreement indicated that the psychiatrists could depend on the staff mental health professionals to bring to their attention problems indicating a need for psychiatric intervention.  Finally, Dr. Halpern's

---

[34]Rather, the contract required Drs. Maughon and Jenkins to conduct the initial evaluation, to prescribe medication, to follow up on patients receiving medication, to be available for consultation, and to consult on an as-needed basis.

[35]There is another error in Dr. Halpern's affidavit—as part of his consideration of the March 19 events, Dr. Halpern assumes that the psychiatrist should have called the emergency room doctor.  There is no substantiation for this claim in his affidavit or in relevant case law.

affidavit was not helpful in establishing the degree to which Dr. Jenkins had allegedly departed from accepted medical standards.

Dr. Halpern's affidavit does refer to three incidents which he suggests indicated a need for more intensive intervention—the February 18 incident in which David was found talking to himself, the March 8 incident when David cut himself and removed the sutures, and the March 15 incident when David was bleeding on the walls and defecating on the floor of the time-out room. Dr. Halpern expressly labels only one of these incidents as psychotic behavior. He does not state why these incidents are so serious as to require medication or more intensive therapy nor does he cite authority for his conclusory suggestion that any doctor would recognize these incidents as calling for more intrusive intervention. In the last analysis, Dr. Halpern's affidavit is conclusory and as such is of relatively little value in our interpretation of the facts of this case. Thus, we are essentially left with little help from the expert in comparing the facts of this case with binding precedent which sets forth the contours of our law in this area.

This is not to say that Dr. Halpern's conclusions are wrong. Rather it is to say that his affidavit does not aid us in our qualified immunity analysis. His affidavit is not the kind of tool which indicates with any specificity the degree to which the doctor here strayed from the realm of accepted professional judgment. The fact that Dr. Halpern used the phrase "total departure from professional judgment, practice or standards, such that it cannot be said that their treatment of David was based on accepted

professional judgment of psychiatric practice" does not foreclose summary judgment when qualified immunity has been properly raised. The affidavit must help the court to discern whether the purported departure was so egregious that, in light of the reported cases, a reasonable professional would have recognized that his behavior amounted to a constitutional violation.

### d. Application of Prior Case Law

Our analysis here will focus first on the plaintiffs' assertion that Dr. Jenkins failed to adequately assess and treat David after the March 18 incident when David stuck a pencil in his March 8 self-inflicted wound. Dr. Jenkins evaluated David on March 19, the day following Dr. Nixon's note in David's record indicating the need for a psychiatric evaluation for anti-psychotic medication.

Relevant to our inquiry into Dr. Jenkins' behavior on March 19 is the fact that Dr. Jenkins indicates that he reviewed David's record prior to examining him. Thus, taking the facts in the light most favorable to the plaintiff, Dr. Jenkins would have known of:

1. David's previous suicidal threats and gestures;

2. David's grandmother's suicide;

3. Dr. Maughon's initial diagnosis of David, "conduct disorder, solitary aggressive type;"

4. David's January 26, 1992, deep possibly self-inflicted puncture wound to his left wrist and his statement that he was going to "cut his arm off and kill himself;"

5. The February 2, 1992, incident when David wrote, "Oh, God I want to die, please take me or I'll commit suicide, Death,

Suicide are the facts of life." on the security screen in his dormitory room;

6. The February 4, 1992, self-inflicted injury to the left wrist and the Progress Note of the same day indicating that David had been presenting as irrational;

7. The February 18, 1992, incident when David was talking to himself and telling a staff nurse that he was talking "to a friend who told him what to do;"

8. The February 24, 1992, incident when David performed some allegedly Satanic ritual in his room, inflicted further injury to left wrist, after which he told a mental health worker that the devil told him not to speak;

9. The March 8, 1992, incident when David cut his arm with a piece of metal in an apparently suicidal gesture, and after which he pulled out the stitches and refused new stitches;

10. The March 15, 1992, incident when David bled on the walls and defecated on the floor of the time out room;  and

11. The March 18, 1992, incident when David re-injured his left wrist by sticking pencil in it and was again sent to the emergency room.

In addition to these facts, Dr. Jenkins would have known that Dr. Maughon had not identified a psychosis, that David's suicidal threats and gesture problem were supposedly being addressed during his weekly therapy sessions, and that David's family could not confirm that he had attempted suicide before coming to Eufaula. The record also indicates that Jurls questioned whether David

experienced genuine suicidal intent,[36] and that whenever he was explicitly asked about it David consistently denied having suicidal intent, a specific suicidal plan, or being depressed.

Having set forth the extent of Dr. Jenkins' knowledge of David at the time of the challenged treatment, we now turn to this circuit's prior cases to determine whether or not the departure in this case is as egregious as those cases, or more so. It is clear that Dr. Jenkins' departure in this case is not as egregious a departure as that of the psychiatrist in *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990). In that case, the psychiatrist—without conducting a mental status exam and without reading an inmate's record—discontinued the inmate's antidepressant medication. Before entering prison, the inmate in *Greason* had been diagnosed as schizophrenic with suicidal tendencies and had been treated at a county mental health center with anti-depressant medication because he had contemplated suicide. Both the inmate's former therapist at the county facility as well as a psychiatrist from the Georgia Department of Human Resources sent letters or reports recommending that the inmate be maintained on his anti-depressant medication. Both of these letters were in the inmate's file. The psychiatrist in *Greason* discontinued the medication without instructing that the inmate be monitored for the adverse effects of discontinuing the medication.

---

[36]For instance, at one point she considered his threats to be for "shock value" and at another she questioned "the actual pervasiveness of his thoughts and whether or not they appear to be more manipulative in nature." In the first suicide assessment, Jurls noted that David's family did not have knowledge of David's past suicide attempts and that David's self-reported past gestures could not be confirmed.

Similarly, the instant facts are not as egregious as those presented in *Rogers v. Evans,* 792 F.2d 1052 (11th Cir.1986). [37] There the court concluded that deliberate indifference to medical needs might be established under the circumstances—i.e., a reasonable jury could find that in response to the justified criticism of past inappropriate medical care, the psychiatrist had simply withdrawn medical care altogether. *Id.* at 1061. The court also considered the fact that the defendant-psychiatrist had treated the inmate's psychotic symptoms with placebos and the fact that the doctor had used Prolixin, a treatment which was arguably grossly incompetent.

A third case, *Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989), preceded *Greason* and involved the same facility and the same psychiatrist. In that case an inmate pled guilty but mentally ill to armed robbery. *Id.* at 1032. When the inmate arrived at the Georgia Diagnostic and Classification Center, a Georgia Department of Corrections facility, in October of 1984, he had been diagnosed as manic depressive and was taking lithium. *Id.* On October 18, 1984, he was evaluated by the defendant psychiatrist who concluded that his psychiatric problems were in remission and withdrew the drugs. *Id.* at 1034. A staff physician recommended another interview because Waldrop was suffering from insomnia, nightmares, and nausea. The psychiatrist saw him again on October 27, 1984, but did not place him on medication. On November 1, 1984, Waldrop slashed his forearm, although the psychiatrist was not notified at

---

[37]This case did not address the qualified immunity issue. Nevertheless, it sets forth binding precedent and as such serves to elucidate the contours of the law in this area.

the time. *Id.* at 1032, 1034. On November 4, 1984, Waldrop gouged his left eye out and was taken to the hospital. *Id.* at 1032. Upon his return from the hospital on November 8, 1984, the psychiatrist examined Waldrop and placed him on two drugs but not on lithium, the antidepressant drug he had previously been prescribed. *Id.* at 1034. The psychiatrist also ordered no emergency measures to protect Waldrop. *Id.* at 1034. Later, at another facility, the inmate cut his scrotum, losing both testicles, and so severely damaged his right eye that he lost his sight in it. *Id.* at 1032. Pursuant to expert medical opinion in evidence, the court held that a jury could reasonably find facts which would rise to the level of a violation of clearly established law.

It is fair to say that the self-injurious actions preceding David's final injury in this case are not comparable to those in *Waldrop;* Waldrop's gouging out his left eye clearly is a more serious incident than the most serious incident in this case prior to the March 24 hanging attempt, namely, the March 8 self-inflicted wound. *Waldrop* is also different from this case in that Waldrop had pled not guilty but mentally ill, had been diagnosed as manic depressive, and placed on lithium, an antidepressant drug, all before coming under the defendant's care. We are satisfied that the defendant-psychiatrist's inadequate response to the symptoms in *Waldrop* are not comparable to Dr. Jenkins' actions in this case.

In summary, we conclude that the facts adduced by plaintiffs fail to show that Dr. Jenkins' actions[38] were such a departure from

---

[38]If Dr. Jenkins' actions on March 19, at which point he was privy to several more incidents of David's self-destructive and possibly psychotic behavior, did not violate clearly established

professional judgment that a reasonable professional in his shoes would have known that his actions violated David's constitutional rights. Plaintiffs' medical expert's testimony fails to establish the degree of alleged departure. Plaintiffs have not adduced facts to demonstrate that Dr. Jenkins' alleged departure from professional judgment was comparable to that previously found to constitute a violation of constitutional rights.

### 3. Dr. Maughon

We next address plaintiff's contentions with respect to Dr. Maughon, the other psychiatrist under contract with Eufaula. Dr. Maughon's involvement with David was limited to his initial evaluation of him on January 23, 1992, and his March 21 prescription of Vistaril over the telephone. Evaluating Dr. Maughon's actions in light of the facts then known to him, it is clear that he had less information than Dr. Jenkins, and that his actions are less suspect than those of Dr. Jenkins.

With respect to the initial evaluation, plaintiffs' expert, Dr. Halpern, notes that David had a family history of suicide, had made prior suicidal threats and attempts, and suggests that these were "obvious signs of clinical depression and bipolar disorder." Based on the foregoing, Dr. Halpern concludes that Dr. Maughon "made no attempt to properly evaluate and treat David for these obvious mental disorders." This cursory conclusion does not aid the appellees here. First, Dr. Halpern's conclusion that David should have been evaluated as clinically depressed with bipolar

---

constitutional rights, it follows that his alleged failure to take action on March 8 did not violate clearly established constitutional law.

disorder upon being admitted to Eufaula is supported only by the fact that David had made prior suicide attempts and threats and that a family member had committed suicide. Dr. Halpern's affidavit does not set forth any support for his conclusory statement that these factors would have led to the diagnosis he contends is the correct one. Although Dr. Halpern states that Dr. Maughon made "no attempt to properly evaluate and treat David," he does not describe what sort of evaluation should have been conducted. Nor does Dr. Halpern indicate whether or how the prescribed treatment should have been different upon David's admittance had he been correctly diagnosed. Second, there are no indications that Dr. Halpern took into account when David's threats were made.[39] Nor did Dr. Halpern note whether such reports of attempts and threats might have been, absent evidence of injury or near injury, manipulative or attention-getting behavior on David's part as both Jurls' and Dr. Jenkins' notes in David's record seem to imply.[40] Finally, Dr. Halpern's affidavit makes no effort to evaluate the degree to which Dr. Maughon had allegedly departed from accepted medical standards.

---

[39]The social history conducted by Jurls simply stated that David had had suicidal thoughts and gestures within the two years before being admitted to Eufaula. His Baldwin County report conducted in August of 1991 did indicate that at least one threat occurred in March 1991.

[40]For example, Jurls wrote on March 2 that David continued to enjoy the "shock value" of talking about suicide. The record seems to indicate that Jurls questioned whether David had ever actually attempted suicide. She noted in the January 27, 1992, suicide assessment form that David's family had no knowledge of David's past attempts and that David's self-reported gestures could not be confirmed. In the same report she described his suicidal thoughts as without genuine intent.

Dr. Maughon's alleged misdiagnosis is less egregious than that of the psychiatrist in *Greason* and *Waldrop.* That psychiatrist knew that mental health professionals outside the prison system had previously diagnosed the inmates as suffering from serious psychiatric conditions and that those outside professionals had recommended that the inmates remain on previously prescribed psychiatric medications. Here the only previous diagnosis available to Dr. Maughon was the psychological evaluation from Baldwin County Mental Health Center, and it did not set forth any diagnosis but recommended only that David return to outpatient counseling and be placed in a residential program if his condition deteriorated. The evidence indicates that as of January 1992, when the initial intake was done, no other doctor or psychologist had suggested that David be evaluated for anti-psychotic medication.[41] Nor does Dr. Maughon's behavior appear to be more egregious than that of the physician in *Rogers v. Evans,* 792 F.2d 1052 (11th Cir.1986), where the doctor was potentially liable for having withdrawn medical care in response to the justified criticisms of the inmate's family and where her use of two different medications were called into question.

After the initial assessment completed on January 23, Dr. Maughon was contacted only once more, on Saturday, March 21. At that time, David had been placed in seclusion after destroying property and threatening to cut himself with a piece of glass. He was beating his head on the wall and cursing loudly. Dr. Maughon

[41]Dr. Nixon, not a psychiatrist, referred David for evaluation almost two months after Dr. Maughon's initial evaluation of David.

was notified by telephone, and prescribed a tranquilizer over the telephone. In evaluating Dr. Maughon's actions under the circumstances the following factors are relevant. There is no evidence that Dr. Maughon reviewed David's record when he was called on the telephone on Saturday, March 21. Thus, we cannot assume that he had the more extensive knowledge which Dr. Jenkins had. Moreover, the incident on March 21 about which Dr. Maughon was consulted was clearly not as serious as the one about which Dr. Jenkins was consulted.[42] Finally, Dr. Maughon, like Dr. Jenkins, could rely on the Eufaula staff to monitor David's progress.

We readily conclude that plaintiffs have failed to show that Dr. Maughon's actions were such a departure from professional judgment that a reasonable professional in his shoes would have known that his actions violated David's constitutional rights. Indeed, the case against Dr. Maughon's is *a fortiori* less compelling than the case against Dr. Jenkins because Dr. Maughon is charged with less knowledge and because the particular incident which triggered his consultation was less serious than that which triggered Dr. Jenkins' evaluation.

D. *Bradley Mazick, Ph.D.*

Dr. Mazick, a psychologist, was clinical director of Eufaula during David's time there. The appellees allege that Dr. Mazick failed to exercise professional judgment both as a psychologist involved with David's care and as clinical director of the facility

---

[42]The notes about this incident in David's record indicate only that "Dr. Maughon was notified about this resident beating and banging head on walls and cursing and totally out of control—He said give Vistaril 50 mg in stat...."

by failing to review David's record, failing to supervise Jurls, failing to reform Eufaula's seclusion and time out policies, and failing to take measures to prevent the alleged abuse at Eufaula. We will first address whether Dr. Mazick's personal treatment of David violated David's constitutional rights and then address whether Dr. Mazick's alleged failure to discharge his administrative/supervisory duties amounted to constitutional violations.

### 1. Dr. Mazick's Treatment of David

The appellees generally contended that Dr. Mazick departed from the most basic professional judgment in his treatment of David. They apparently base this allegation on his alleged failure as a general matter to supervise and to ensure for David the necessary and essential psychiatric treatment, and his failure to see David until two months after David was assessed and recognized as having made suicidal threats and gestures.

Dr. Mazick had only two personal contacts with David. The first was shortly after David injured his left wrist. Dr. Mazick secluded him sometime after that incident and asked him about his arm at that point. Then Dr. Mazick saw David briefly on March 24 when he had an informal conversation with him.[43] Plaintiffs have failed to adduce evidence that Dr. Mazick knew that David had attempted to hang himself on March 22. The record indicates that he had not seen the March 22 entry nor did he know that David had

---

[43]In his deposition, Dr. Mazick testified that he saw David in the hallway and that David requested to speak with him.

attempted to injure himself on March 21.[44]  The plaintiffs presented no further evidence from which a fact finder could infer that Dr. Mazick knew of the March 22 hanging attempt.  Although the expert affidavit asserts that Dr. Mazick's behavior was not based on professional judgment because he failed to review the record, it is not clear that Dr. Mazick's failure to review the record in this situation rises to the level of unconstitutionality.  First, the record does not indicate that Dr. Mazick was involved in the decision to take David off close observation.[45]  Second, plaintiffs have not adduced evidence to suggest that Dr. Mazick could not delegate the responsibility to Jurls and McBride to review residents' records and to bring relevant information to his attention.  Finally, the affidavit of plaintiffs' expert, upon which plaintiffs apparently rely to show deficient professional supervision, is wholly conclusory and is of little assistance.

We readily conclude that plaintiffs have failed to show that a reasonable professional in Dr. Mazick's shoes would have known that his actions violated David's constitutional rights.

## 2. Dr. Mazick's supervisory duties

The plaintiffs allege that Dr. Mazick's failure to discharge

---

[44]Mazick noted that David was due to be off close observation status because he had been free of self-injurious behavior for several days.  However, had he looked at David's record, he would have realized that there were two self-injurious incidents over the weekend.  Apparently, he was inferring that such was the case from David's comments and from Jurls' decision to take David off close observation.

[45]He did indicate after the fact that he told David that he saw no reason David should not be taken off close observation, but the record does not show nor do the plaintiffs contend that he took part in that decision.

his supervisory duties violated clearly established constitutional law and bore a causal relationship to David's injury. It is true that in some situations, supervisors may be held liable for failing adequately to train and supervise their subordinates.

> [Supervisory] liability under section 1983 "must be based on something more than a theory of *respondeat superior.* Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."

*Cross v. Alabama Dep't. of Mental Health & Mental Retardation,* 49 F.3d 1490, 1508 (11th Cir.1995) (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990)); *accord Dean v. Barber,* 951 F.2d 1210, 1215 (11th Cir.1992) ("[A] supervisor may be held liable under section 1983 if the supervisor had personal involvement in the constitutional deprivation or if a sufficient causal connection exists between the supervisor's conduct and the constitutional violation."). A supervisor sued in individual capacity is entitled to qualified immunity unless a reasonable supervisor would have known that his or her actions were unlawful in light of clearly-established law and the information possessed. *Greason,* 891 F.2d at 836-37.

The plaintiffs allege that Dr. Mazick failed to fulfill his supervisory responsibilities, including his duty to supervise Jurls, his duty to review David's clinical course on a regular basis given the fact that he "had knowledge of David's suicidal condition" and to monitor the amount of treatment David was getting. The expert affidavit of Dr. Hamilton asserts that Dr.

Mazick "should have" reviewed David's clinical course on a regular basis and monitored Jurls. However, the expert's affidavit provides no support for his conclusory opinion. Neither the expert's affidavit nor any other evidence adduced by plaintiffs supports their assumption that it was improper for Dr. Mazick to rely on Jurls to bring relevant matters to his attention.

Significantly, Dr. Hamilton does not address the issue of the degree to which Dr. Mazick's actions allegedly departed from accepted professional standards, and thus does not help plaintiffs discharge their heavy burden in that regard. Dr. Hamilton did suggest that in Alabama only psychiatrists and psychologists could diagnose mental illness. However, neither plaintiffs nor their expert indicate why, after a psychiatrist's diagnosis was made, Dr. Mazick could not rely upon Jurls to bring relevant matters to his attention.

None of our case law indicates that a supervisor's failure to monitor an individual patient's progress amounts to deliberate indifference or failure to exercise professional judgment. Thus, even if Dr. Mazick's actions departed in some degree from accepted standards, plaintiffs have failed to carry their burden of establishing such an egregious departure that a reasonable professional in Dr. Mazick's shoes would have known that he violated David's constitutional rights. Dr. Mazick's actions are not as egregious as the actions of Drs. Oliver and Duncan, the medical administrators who were denied qualified immunity in *Greason.* Both doctors were aware of the severe inadequacies of the institution, including the clearly inadequate number of

professional staff. Both knew that the particular psychiatrist assigned to the inmate had an excessive burden. Both were aware that the psychiatrist had discontinued Greason's medication. Both were aware of the previous incident, i.e., the *Waldrop* incident, in which an inmate had plucked out one of his eyes, severely injured the other eye, and cut his scrotum losing both testicles after the same psychiatrist first discontinued that inmate's psychiatric medication and failed to reinstate one of the medications. *See Waldrop,* 871 F.2d at 1032. Thus, *Greason* does not indicate that Dr. Mazick's conduct violated the Constitution.

Nor are Dr. Mazick's alleged supervisory failures comparable to those in *George v. McIntosh-Wilson,* 582 So.2d 1058 (Ala.1991). In that case a severely mentally retarded patient died when he was left unattended and choked on a rubber glove left within his reach. In that case the court concluded that a fact finder could infer that the administrator failed in her duty to disseminate information to the non-professional direct-care employee regarding the patient's dangerous mouthing habit.

The appellees also assert that Dr. Mazick was responsible for the constitutional violations inherent in Eufaula's seclusion practices, specifically the "inhuman conditions in building 112" as well as the manner in which time out and other forms of restrictions were used. The appellees allege that these practices violated the law set forth in *Romeo.* Plaintiffs' claim fails both factually and legally.

With respect to Building 112, appellees cite no evidence that specifically sets forth that the conditions were inhumane.

Although the appellees allege that seclusion in Building 112 had no therapeutic effect, none of the documents they cite support that conclusion. Rather the documents cited by the appellees merely indicate that reforms were necessary with respect to Eufaula's seclusion and restraint system. Nor have plaintiffs presented expert testimony indicating that the restraints used in Building 112 constituted a failure to exercise professional judgment. Plaintiffs' argument with respect to time-out and other forms of restrictions fails for the same reasons.

Plaintiffs' claim also fails legally. A conclusory allegation that the use of Building 112's seclusion facility violated *Romeo* is insufficient, absent precedent that more clearly sets forth what form of restraint is violative of *Romeo*. Although *Romeo* stated that the mentally retarded patient in a state institution did have a liberty interest in freedom from bodily restraint, *id.,* 457 U.S. at 316, 102 S.Ct. at 2458, the Court went on to note that that liberty interest was not absolute. *Id.* 457 U.S. at 319, 102 S.Ct. at 2460. Rather the " "liberty interest of the individual' " had to be balanced with " "the demands of organized society.' " *Id.* 457 U.S. at 319, 102 S.Ct. at 2460. Citing *Bell v. Wolfish,* 441 U.S. 520, 540, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979), the *Romeo* court indicated that while pre-trial detainees, for instance, could not be punished, restraint of pre-trial detainees "reasonably related to legitimate government objectives and not tantamount to punishment" was upheld. *Romeo,* 457 U.S. at 319, 102 S.Ct. at 2460. The Court further indicated that balancing would be left to the professional judgment of the qualified staff members and that

courts need only make certain that professional judgment was exercised.  Finally, the Court in *Romeo* never indicated that the restraints used in that case were violative of the patient's due process rights.[46]  The appellees have not cited other cases which would indicate that the sort of restraint used here would violate David's right to be free from bodily restraint.  Plaintiffs have relied on merely abstract propositions, which the court in *Lassiter v. Alabama A & M University, Board of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc), held was clearly insufficient.

Appellees also allege Dr. Mazick was responsible for not taking remedial actions to halt the beatings and abuse at Eufaula. Eleventh Circuit cases have held that administrators' failure to abate violence and abuse may constitute deliberate indifference. *See, e.g., Hale v. Tallapoosa County,* 50 F.3d 1579 (11th Cir.1995) (where inmate on inmate violence was regular during overcrowding and where it was severe enough to require medical attention and even hospitalization on occasion);  *LaMarca v. Turner,* 995 F.2d 1526, 1535 (11th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (where in a prison context unnecessary pain and suffering standard met by "unjustified constant and unreasonable exposure to violence").  However, the evidence presented by the plaintiffs does not indicate that Dr. Mazick was apprised of an extent of violence and abuse which would have put him on notice that his failure to act in the face of such abuse and violence would rise to the level of a constitutional violation.

---

[46]In *Romeo*, the patient was physically restrained during portions of each day through the use of soft restraints which apparently bound the arms only.

With respect to the allegations that abuse was rampant at Eufaula, the appellees have presented as evidence the affidavits of John Fowler and Billy Kirby as well as the testimony of Allen Forte. The affidavit of Kirby did allege that Dr. Mazick knew about the beatings. Specifically, Kirby stated that he complained to Dr. Mazick that "all of [the residents] were being hit by staff members including ... David ... and lots of others." However, we do not believe that this limited information would support a finding that violence and abuse were so rampant that failure to react would constitute a clearly-established constitutional violation. Plaintiffs also presented as evidence of abuse and violence the FY 1991-92 Advocacy Monitoring Report. That report, for the reasons discussed *supra* at Part I, did not provide sufficient evidence to indicate that physical abuse was such that a jury could infer that Dr. Mazick knew that the abuse and violence were rampant. The report only concluded that incident investigations were inadequate; it only detailed a few allegations and none had been substantiated.[47] Thus, we do not believe that the case law clearly established that a reasonable professional possessing the knowledge that Dr. Mazick had would have known that his actions violated David's constitutional rights.

E. *Anthony Dykes*

---

[47]A jury might infer that Dr. Mazick had learned of the plight of the resident discussed in Allen Forte's affidavit. Allen Forte testified that one resident had to be taken to the hospital twice to be treated for injuries incurred when other residents sexually abused him. However, even assuming Dr. Mazick knew of these two incidents also, the totality of what he knew does not create an inference that the episodes of abuse at Eufaula rose to the level discussed in the text.

Anthony Dykes was the director of the Eufaula Adolescent Center. Dykes was not trained in psychology, psychiatry, or social work, thus Dykes was not a mental health professional. Nevertheless, as an administrator or supervisor, he would be liable if he participated in the constitutional violation or if a causal connection existed between his actions and the constitutional deprivation. *Cross v. Alabama Dep't. of Mental Health & Mental Retardation,* 49 F.3d 1490 (11th Cir.1995).

First, appellees contend that Dykes failed to make sure David was free from unnecessary bodily restraints, i.e., that he allowed the practice of restraining patients for punitive rather than therapeutic purposes, and that he allowed the use of building 112 for seclusion. For the reasons discussed above with respect to Dr. Mazick, this allegation must fail.

Second, the appellees allege that Dykes failed to make sure that David did not experience abuse at Eufaula. Although, Kirby's affidavit asserts that he told Dykes of the beatings children received at the hands of staff or other residents, this allegation must fail for the reasons set forth *supra* in our discussion of this allegation with respect to Dr. Mazick.

Third, the appellees contend that Dykes violated David's constitutional rights by failing to make sure conditions at Eufaula were safe, among other things, by failing to remove the bars from the dormitory closets. We first note that Dykes could reasonably rely on subordinates to ensure that a child who was at risk of doing harm to himself would be placed on close or continuous observation or that other precautionary measures might be taken.

More importantly, we find no case law indicating that Dykes violated clearly established constitutional rights.[48] This case is distinguishable from *Greason;* there the non-professional administrator was held liable because he took no corrective action, notwithstanding having been specifically put on notice of particular defects or inadequacies in his facility.[49] Unlike the situation in *Greason,* no evidence of earlier incidents of injury involving the alleged inadequacy, i.e., the bars in the dormitory closets, was presented.

Fourth, the appellees also contend that Dykes failed to make certain that David had adequate medical care, specifically adequate psychiatric care, or adequate individual treatment as would give him the realistic opportunity to be cured or to improve his medical condition. However, there is no indication that Dykes knew the details of David's history of suicidal threats or gestures or that Dykes knew about the specific behaviors David exhibited while at Eufaula. Moreover, appellees' complaints about Dykes in this regard rely on abstractions, which we readily conclude are insufficient. *See Lassiter,* 28 F.3d at 1150.

---

[48] In *Belcher v. City of Foley,* 30 F.3d 1390 (11th Cir.1994), this circuit held that it was not clearly established that "a reasonable jail official, who knew that an inmate could hang himself by tying some material to the bars of a jail-cell door and yet who failed to prevent that possibility, was acting with deliberate indifference to an inmate's taking of his life." *Id.* at 1399.

[49] In that case, Kemp, the warden of the facility where an inmate committed suicide, knew of particular inadequacies in his facility but did nothing to correct them and knew a similar incident had occurred previously but did nothing to investigate that previous incident or prevent it from happening again. *Greason,* 891 F.2d at 839-40.

Fifth, the appellees argue that Dykes took no steps to insure that Joint Commission on Accreditation of Health Organizations ("JCAHO"), accreditation was attained as required under the *Wyatt* Consent Decree as amended and approved in *Wyatt v. Wallis,* 1986 WL 69194, *6 (M.D.Ala.1986). We need not address whether a consent decree can in other circumstances clearly establish the constitutional law,[50] because we hold in this case that neither the Consent Decree nor any other precedent clearly established a constitutional right to JCAHO accreditation. As one of many remedial measures, the *Wyatt* Consent Decree required the state officials "to make all reasonable efforts to achieve full accreditation of Alabama's mental health facilities by the Joint Commission on the Accreditation of Hospitals...." *Id.* at *6. That mandate, however, does not mean that lack of accreditation is a per se constitutional violation. Such a proposition would be anomalous, and surely is not clearly-established constitutional law.

Finally, the appellees contend that Dykes and his subordinates exhibited such a degree of indifference to the policies and procedures that the staff could not have based their decisions on professional judgments embodied in the policies. *See George v. McIntosh-Wilson,* 582 So.2d 1058, 1063 (Ala.1991) ("[P]olicy-making administrators would be liable for the

---

[50]*See Clark v. Evans,* 840 F.2d 876, 880 n. 4 (11th Cir.1988); *Williams v. Bennett,* 689 F.2d 1370 (11th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); *Jackson v. Mississippi,* 644 F.2d 1142 (5th Cir. Unit A May 1981). *See also Long v. Norris,* 929 F.2d 1111 (6th Cir.), *cert. denied sub nom. Jones v. Long,* 502 U.S. 863, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991); *Green v. McKaskle,* 788 F.2d 1116 (5th Cir.1986).

constitutional deprivations caused by their subordinates if they exhibited such a degree of indifference to compliance with their policies as to demonstrate that they did not base their actual administrative decisions or actions on the professional judgments embodied in the policy.") However, neither the appellees' expert affidavit nor other evidence in the record indicates which policies were violated as a result of Dykes' failures.[51] Nor do appellees identify the clearly established constitutional rights implicated by such policies. We readily conclude that appellees have failed to establish that these alleged deficiencies on the part of Dykes violated David's clearly established constitutional rights. *Lassiter,* 28 F.3d at 1150.

F. *Emmett Poundstone*

Emmett Poundstone was ADMHMR Associate Commissioner for Mental Health. The Eufaula facility was within the scope of Poundstone's responsibility. Poundstone was not a mental health professional. The plaintiffs claim that Poundstone failed to make sure that the Eufaula staff were trained in suicide assessment and in recognizing suicidal tendencies. We readily conclude that this claim has no merit. Where an institution is staffed with health care professionals, including licensed psychologists, psychiatrists and social workers, we know of no cases which indicate that in this circuit the failure of a state-wide administrator to make provisions for such training for the mental health care

---

[51]Although it is alleged that Eufaula's policy was violated when David was admitted in contravention of the policy against admitting actively suicidal patients, it is not alleged that Dykes took part in that decision or that he could be directly implicated in that decision.

professionals constitutes a violation of clearly established

constitutional rights.[52]

As noted in the margin, the remaining claims by plaintiffs

against Poundstone fail for reasons already discussed.[53]

G. *Royce King*

Royce King was ADMHMR commissioner. He is not a mental

health professional. The appellees allege that King and his

subordinates exercised such a degree of indifference to compliance

---

[52]In *Greason,* numerous failings combined to persuade the court to deny qualified immunity to Dr. Duncan, who held the state-wide position of Director of Mental Health for the Georgia Department of Corrections. Dr. Duncan was aware of the previous and very similar Waldrop incident, was aware that the same psychiatrist primarily responsible for the Waldrop incident was the only source of psychiatric care for Greason, was aware that he could not adequately treat all of the inmates requiring mental health care, was aware that the particular institution made no provision at all for mental health treatment plans, and in general was aware of the conditions at the institution that constituted grossly inadequate mental health care. Nevertheless, Dr. Duncan failed to take any remedial action. Amongst the claims of Dr. Duncan's deficiencies was a claim superficially similar to, but actually much different from the instant claim—i.e., that Dr. Duncan knew that the institution had no policies or procedures designed to help the nonprofessional prison staff and guards recognize suicidal tendencies and prevent suicide attempts. Not only was that alleged deficiency merely one of a number of more serious deficiencies, the instant claim against Poundstone is not that he knew that Eufaula's provisions for suicide assessment were wholly inadequate, but rather that he merely failed to ensure that there were policies requiring more training. We readily conclude that the *Greason* precedent is wholly inapposite.

[53]The plaintiffs contend that Poundstone is not entitled to summary judgment because (1) he failed to take measures to stop the beating and abuse at Eufaula, (2) he failed to change the allegedly unconstitutional seclusion and time-out policies, and (3) he failed to ensure that Eufaula acquired JCAHO accreditation. The first and second allegations fail for the reasons set forth in Section IV.D., in our discussion of this claim with respect to Bradley Mazick. The third claim fails for the reasons set forth in Section IV.E., in our discussion of this claim with respect to Anthony Dykes.

with the ADMHMR policies that they did not base their actual administrative decisions on professional judgment.  However, the appellees do not indicate which particular policies King and his subordinates ignored.  Nor do appellees identify the clearly-established constitutional rights implicated by such policies.  Thus, we readily conclude that appellees have failed to demonstrate a violation of clearly established constitutional rights.  *See Lassiter,* 28 F.3d at 1150.  Appellees do make a specific contention about King's deficiencies with respect to the *Wyatt* Consent Decree, i.e., the failure of Eufaula to acquire JCAHO accreditation.  However, this claim fails for the reasons stated in Part IV.E., *supra.*  The appellees also allege that King knew that children were being secluded under improper conditions and failed to take action.  For the reasons set forth in Part IV.D., *supra,* this argument also fails.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of summary judgment as to Karen Jurls, and we reverse the court's denial of summary judgment as to the remaining appellants.

AFFIRMED IN PART and REVERSED IN PART.

EDMONDSON, Circuit Judge, dissenting in part and concurring in the result in part:

A great deal of today's opinion is right.  I cannot concur, however, in the decision on Karen Jurls.

In my judgment, when Ms. Jurls in 1992 acted or failed to act, it was not already clearly established as a matter of law that the rights, under the fourteenth amendment's due process clause, of mental patients involuntarily civilly committed to state

institutions would always be the same as the rights, under the eighth amendment, of convicts in prisons even if the circumstances were otherwise similar.  Therefore, I cannot agree that Ms. Jurls (and every reasonable social worker in her place) would be expected to know that *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990)—a prison case decided on eighth amendment grounds—clearly established as a matter of law the rules governing her conduct outside of a prison and under the fourteenth amendment.

The difference between a prison and some other kind of institution and the difference between the eighth amendment and the fourteenth amendment's due process clause are enough, at least, to cloud the question.  To apply *Greason* outside of a prison is not to follow *Greason,* but to extend it.  I do not believe that nonlawyers must foresee such extensions or forfeit their immunity.  To me, this practice flies in the face of the idea that qualified immunity protects against personal liability unless the defendant's acts violated clearly established *pre-existing* law.

I know that the Supreme Court in *Romeo* wrote among other things that persons civilly committed are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  But those words are not the holding of *Romeo.* They explain the *Romeo* decision in part:  they explain why the "deliberate indifference" standard used for prisons was not adopted for mental institutions.  But *Romeo* does *not* hold that every act that violates the eighth amendment rights of a prisoner will doubtlessly violate the due process rights of those involuntarily civilly committed to state

institutions.  In my view, this idea is not clearly established as a matter of law now and was not so established in 1992.

I do not say that the Supreme Court's words that I have quoted are totally without significance;  they have some value as predictors.  But, I do say the words do not establish law, in themselves.  And, by the way, this Circuit has also never held that the due process rights of mental patients always, at least, equal the eighth amendment rights of prisoners.  Therefore, today's court's heavy reliance on *Greason*—an eighth amendment decision—as the case that in 1992 had already *clearly established* rights outside of the eighth amendment's prison context seems too shaky. I cannot go along.

For me, *Greason,* in the light of the words I have quoted from *Romeo,* does *suggest* that courts might ultimately decide that the law requires mental health workers outside of prisons to follow or to exceed the eighth amendment guidelines.  But, in *Lassiter,* we said for precedent to *suggest* something about the applicable law was just not enough.

We said the "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances."  Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc) (emphasis in the original).

In 1992, *Greason* did not (and in my view, as a matter of law, could not) truly *dictate* the essential conclusion for Karen Jurls

and those like her who were working outside of prisons.  I cannot hold this social worker to a clearer understanding of the law—particularly of the precedential authority of *Greason*—than I have.

I dissent from the result for Karen Jurls, but concur in the result otherwise.